## W. C. LAMBERT v. ST. LOUIS & GULF RAILWAY COMPANY, Appellant.

**In Banc, June 6, 1908.**

1. **APPEAL: Reference to Transcript: Abstract.** The rules of the Supreme Court require a printed abstract, and the court will not hunt through a long transcript in long form in a civil case to decide disputes in evidence, though referred thereto by counsel; but appellant having filed a printed abstract, and no counter abstract being filed thereto by respondent or complaint made, appellant's abstract will be conclusively presumed to contain all the record essential to a just determination of the case on appeal.

2. **INJUNCTION: Threatened Trespass: Right to Possession.** Although the issue is one of the fact of possession and there is evidence that it was a "scrambling possession" at the very time defendant is alleged to have broken plaintiff's close and

committed trespass on the land, yet if defendant is threatening to continue such wrongful acts, injunction is a proper remedy, though the suit in the end resolves itself into one for quieting title.

3. ———: ———: Multiplicity of Suits. In the absence of a showing that a railroad company and the men who personally directed the tearing down of plaintiff's fences were insolvent, he would have a remedy at law for damages for the trespass already committed. But to put a stop to defendant's trespasses and to its threats to tear down the fences as often as they are erected and to avoid a multiplicity of suits, plaintiff is entitled to equitable relief, by the writ of injunction.

4. PURCHASE OF LAND: Verbal Contract: Statute of Frauds: Performance. Where the vendee pays the full purchase price and takes possession with the consent of the vendor, the case is taken out of the Statute of Frauds, and the vendee is entitled to a decree vesting the title in him.

5. ———: ———: ———: This Case. A triangle of plaintiff's land, about one acre in size, was bounded along its long side by the right of way of a railroad company and on the other two sides by public roads. It jutted up against the station yards, and between it and the station house a switch track was laid. Plaintiff was willing to sell, and removed his fences, and for a time it was unoccupied. Then a grain dealer proposed establishing a warehouse on it and the right of way, but was not willing to build unless the railroad company acquired the triangle. He and the road's superintendent and an agent to obtain rights of way appeared at the station, and it was ascertained that plaintiff would sell for $50, and the three pooled what cash they had in hand and the superintendent gave the amount to plaintiff, who received it, and the railroad company reimbursed them. Thereupon, the company closed an agreement with the grain dealer granting him a permit in the nature of a lease to build and operate a grain warehouse, located in part on the triangle and in part on the right of way, and he at once erected the warehouse, and later another grain dealer built another warehouse under like conditions, and they began and continued the business of handling grain, using the triangle, and thenceforward it was used for necessary shipping purposes in loading and unloading wagons and cars of freight and in storing heavy freight, and was otherwise devoted by the railroad company to commercial uses. These facts plaintiff knew, and acquiesced in them, and bought the warehouses, which were not fixtures, from the grain dealers, took possession and engaged in handling and shipping grain himself, and dealt in corn and built some corn pens on the triangle, erected some fences inclosing the pens and connected them with the ware-

houses, and as time went on he gave visible signs of ignoring the right of the railroad company to the triangle. The building of the fences being without the consent of the company, and in an assertion of plaintiff's right as absolute owner, the company caused the fences to be torn down and when he rebuilt them it tore them down again, and then plaintiff brought this suit to enjoin further trespasses. There was evidence that he claimed damages for stock killed, and other injury done, and that he claimed the $50 paid was a credit on his claim for these damages, and that he would make a deed when the damages and the price of the land were paid, and there is nothing to indicate that his claim was discussed at the time the money was paid. The verbal contract was made with the superintendent in 1894, who was dead at the time of the trial, and for that reason defendant objected to plaintiff's testifying as to the terms of the contract. After the money was paid the president of the road insisted that a deed be obtained and asked plaintiff to make a deed, but he flatly refused and stated that he would not do so until the company paid his claims. Nothing was done towards obtaining a decree vesting title in defendant until this suit was brought in 1903. *Held*, that the possession taken by the railroad company with plaintiff's consent, fortified by the prior payment of the purchase price in compliance with the verbal contract *ipso facto* and *eo instanti* vested the paramount equitable title in the company, and thereafter plaintiff held only the mere naked legal title seized to the use of the company, and defendant was entitled to specific performance in a strict sense if the pleadings had been drawn on that theory. They were not so drawn, but as the answer states a good case under section 650 for ascertaining and determining the title, that is done, and it is decreed to be in defendant.

*Held*, by **Valliant, J.,** dissenting, first, that the evidence of the existence of defendant's oral contract was not that cogent, clear and convincing proof which a court of equity requires when it is called upon to enforce a contract in the face of the Statute of Frauds; and, *second*, defendant has slept too long on its rights, even if its rights to such a decree were shown in 1894, when it claims the oral contract was made.

6. **TRESPASS: Injunction: Quieting Title.** Where plaintiff brings suit to enjoin defendant from further trespassing on his land, and the answer denies the allegations of the petition, and by way of affirmative matter alleges defendant owns the land and claims title thereto, and prays the court to try, ascertain and determine the title, and plaintiff replies denying that defendant has any title or interest, and the evidence shows that defendant bought and paid for the land under a verbal contract and took possession with plaintiff's knowledge and consent, the

plaintiff is not entitled to a decree enjoining defendant from entering upon the land, but the injunction should be dissolved, and the title decreed to be in defendant.

7. **TESTIMONY: Other Party Dead.** Where defendant's superintendent, who made the contract in its behalf for the purchase of the land, is dead, it is not error to permit plaintiff to deny the testimony of a living witness as to where the contract was made and where the money was paid.

Appeal from Scott Circuit Court.—*Hon. Henry C. Riley*, Judge.

REVERSED AND REMANDED (*with directions*).

*L. F. Parker, Moses Whybark* and *W. F. Evans* for appellant.

(1) Even though conceding for the purpose of this case that the defendant was guilty of wrongfully invading plaintiff's possession of the land described in the petition, yet injunction was not his remedy. The damages were not irreparable, nor the defendant insolvent, and the plaintiff had an adequate remedy at law. Sills v. Goodyear, 80 Mo. App. 132; Echelkamp v. Schrader, 45 Mo. 505; 3 Pom. Eq. (2 Ed.), secs. 1347, 1350; Railroad v. Dey, 1 L. R. A. 744. (2) Crowder, who represented the railroad company in the purchase of the land from plaintiff, was dead, and the court erred in permitting the plaintiff to testify as to any transaction had with him. Williams v. Edwards, 94 Mo. 447; Banking House v. Rood, 132 Mo. 256; Real Estate Co. v. Building Co., 196 Mo. 358. (3) That Crowder bought the land from plaintiff for the railroad company, and paid him for it, and the railroad company then entered into possession and exclusively used it for a depot and yard purposes at the station of Benton, and it was so used until this controversy came up, is clearly established by the testimony of Anderson, Houck, L. B. Houck, Heisserer, Hunter, Hawkins and Brooks; and the grain ware-

houses were then erected. This was sufficient to take the contract out of the Statute of Frauds, and vest complete equitable title in the defendant for the purpose for which it bought the land. Young v. Montgomery, 28 Mo. 604; Price v. Hart, 29 Mo. 171; Underwood v. Underwood, 48 Mo. 527; Bean v. Valle, 2 Mo. 126; Townsend v. Vanderwerker, 160 U. S. 171; Roberts v. Templeton, 3 L. R. A. 790. (4) The possession by the railroad company was for depot and yard purposes, and the land was held by it for those purposes in the usual manner, and with the knowledge and consent of the plaintiff. This possession was sufficient. Keen v. Schweigler, 70 Mo. App. 409; Draper v. Shoot, 25 Mo. 203; Pacific Exp. Co. v. Tyler Office Fixture Co., 72 Mo. App. 151. (5) The grain warehouses possessed by the plaintiff had been built on the land by Crenshaw and Anderson by permission of the railroad company, and not by permission of the plaintiff. They held by verbal lease from the railroad company as its tenants, and plaintiff obtained possession of these warehouses by purchase from Crenshaw and Heisserer, who bought from Anderson, and he, plaintiff, held under the railroad company, and by his purchase recognized it as his landlord, and became its tenant. He, therefore, cannot dispute the title of the railroad company without first restoring to it the possession. Stewart v. Miles, 166 Mo. 181.

*Marshall Arnold* and *Frank Kelly* for respondent.

(1) Injunction is the remedy. Damschoeder v. Thias, 51 Mo. 100; Coal Company v. St. Louis, 130 Mo. 323. Though a trespasser be solvent, yet when his trespassings are harassing, continuous, and involve a multiplicity of suits, injunction will lie. Land Company v. Manning, 98 Mo. App. 248; Palmer v. Crisle, 92 Mo. App. 510. (2) That respondent was not competent to testify as to the terms of the con-

tract made with Crowder, who was dead at the time of the trial, is conceded, and we insist he did not do so. He did have the right to contradict the living, and we submit that is all he did. (3) Where an agreement for the sale of real estate is required by the Statute of Frauds to be witnessed by a writing, or memorandum, the writing must contain the whole agreement. Rucker v. Harrington, 52 Mo. App. 481; Miller v. Goodrich Bros. Bank, 53 Mo. App. 433; Weil v. Willard, 55 Mo. App. 376; Ringer v. Holtzclaw, 112 Mo. 519. Why, then, enforce an oral contract for the sale of lands, as insisted on by appellant, when no part of its terms or conditions are shown? And especially, as in this case, the possession by the alleged purchasers was doubtful in the extreme, and no improvements made except what has been bought and paid for by respondent? The so-called possession of appellant does not meet the requirements set forth in Charpiot v. Sigerson, 25 Mo. 63. The courts have many times defined the character of evidence and the degree of proof for sale of real estate required to take a case out of the Statute of Frauds. In the first case cited by appellant, Young v. Montgomery, 28 Mo. 604, the court said: "The circumstances of the particular case must be fully disclosed in order," etc. The case at bar does not meet that condition. In Underwood v. Underwood, 48 Mo. 530, cited by appellant, the court says: "But it is not only indispensable that the acts done should be clear and definite and referable exclusively to the contract, but the contract should also be established by competent proof, and be clear, definite, and unequivocal in all its terms." The rule and reasons therefor are given in Berry v. Hartzell, 91 Mo. 137, which case is quoted and approved in Brownlow v. Fenwick, 103 Mo. 427; Hubbard v. Hubbard, 140 Mo. 300; Alexander v. Alexander, 150 Mo. 579; Gibbs v. Whitewell, 164 Mo. 387. In all the cases on this

point it is held the evidence must be clear and convincing as to the existence and character of the contract. McKee v. Higbee, 180 Mo. 263; Sitton v. Shipp, 65 Mo. 297. (4) Under the fourth point in appellant's brief he speaks of the "possession" by the railroad. This so-called "possession" was the possession of the people in general passing to and fro over the unfenced land of respondent in shipping and receiving freight from the road, and the building of the warehouses part on the land in dispute and part on the right of way. And now because the respondent did not stand around the grounds and order the people off of it, or advise every one who came upon it that it was "his" land, appellant attempts to construe his failure to into a possession of the road with the knowledge and consent of respondent. We do not believe we have reached that condition of affairs where one owning a piece of land lying in a public place and liable to be walked upon by passers-by must, to be assured of his title, get out and blow a trumpet and solemnly warn everybody that the land is his, or have it taken away from him. That possession is not such as the law demands in cases of this kind. Charpiot v. Sigerson, 25 Mo. 63; Emel v. Hayes, 102 Mo. 186; Eaton on Equity, sec. 275, p. 555. Courts will refuse a decree of specific performance unless the purchaser has taken possession and made valuable improvements on the faith of it. Eaton on Equity (Horn Book Series), p. 31; Taylor v. Van Schrader, 107 Mo. 206. The trial court heard the witnesses, and more than that knew them personally, had heard many of them testify before, knew all the interests and relations they bore to the case, sat as a jury and tried the issues and the court found that the respondent is the "owner of and in the possession of" the piece of ground in dispute. The possession as an issue of fact was found by the trial court against the appellant, and the appellate

court will not disturb the finding. James v. Insurance Co., 148 Mo. 1; Banking Co. v. Brown, 165 Mo. 37; Golden v. Tyer, 180 Mo. 204; Mathewson v. Kilburn, 183 Mo. 118.

LAMM, J.—From a decree in the Scott Circuit Court, finding that plaintiff owns and is in lawful possession of a triangular bit of land in Scott county, and has on this land two warehouses in which he stores grain, six corn pens holding three thousand bushels of corn, and fences enclosing and protecting the warehouses and pens, and that defendant has repeatedly entered the premises tearing down said fences when re-erected and threatens to continue such trespass in the future, and which decree makes perpetual a temporary injunction against defendant, its agents, servants and employees, enjoining them from tearing down plaintiff's said fences or in any way interfering with his free and uninterrupted use of the premises, defendant on due steps appeals to this court.

The case was assigned to Division One and came into Banc because a majority of that division was unable to concur in the opinion of our learned brother VALLIANT, affirming the judgment, *nisi*. In Banc on re-argument six of his brethren were of opinion the judgment should be reversed and remanded with directions. Hence the case was reassigned for a principal opinion, and the divisional opinion of our learned brother VALLIANT will appear as a dissenting one. In our brother's opinion a map appears—a part of the record of the case—of value in getting at an understanding of the *locus* and its environment.

The case (in small compass) is this:

Defendant is a railroad corporation owning and operating a line of railroad through Scott county running near the town of Benton. This railroad was built in 1893 by Houck's Missouri & Arkansas Railroad

Lambert v. Railroad.

Co. Defendant, its successor by purchase, holds under a deed from the building company, not only conveying the line of road, but "all the rights of way, terminals, *station grounds,* stations, shops, roundhouses, sidings, switches and YY's, municipal and other franchises, and all *lands,* tenements, rights and privileges, etc.; now owned or hereafter acquired in and about the construction and operation of the railroad aforesaid." The bit of land in dispute will hereinafter be called "the triangle." The building of the road cut off this triangle (an acre or so) from the main body of plaintiff's farm. Thereupon he moved his fences away and the triangle lay out as commons—said triangle having for its base the Benton & Charleston public road on the north, for its perpendicular the Benton & Blodgett public road on the west, and for its hypotenuse on the east the 100-foot railroad right of way. The town of Benton lies on a hill, a distance off, and the railroad curved in towards this hill as closely as may be, the company locating Benton station on its right of way in such a way that its north end lies flush with the south side of the Benton & Charleston public road and adjacent to the triangle. The topography of the country was such as to make this little triangle a great convenience as depot grounds in affording the possibility of shipping facilities to the public at large and access to the depot, etc. Accordingly when the question of building the depot came up and it was found that the outlying triangle cut off the depot from the Benton & Blodgett public road, Mr. Houck, on behalf of the railroad company, opened negotiations with Mr. Lambert to make an out-and-out gift of it to the railroad company for depot purposes, but these negotiations fell through. Lambert was willing to sell, not give, and the railroad company was too poor to buy in the pickle it was in. The case proceeds on the theory that Mr. Lambert was interested

as a matter of public spirit and personal gain in estab-
lishing adequate shipping facilities at Benton station
and was willing to part with the triangle to that end,
provided he was paid fifty dollars therefor.    Things
drifted in this shape for a spell when presently Mr.
Anderson, a grain dealer of St. Louis, appeared on
the scene and proposed establishing a warehouse at
Benton station for handling and dealing in grain at
that point. The main line of the railroad runs east
of the depot.   Immediately west and very close to the
triangle is a switch.    Whether this switch was built
before the happening of things to be related or after-
wards is dark.   At any rate, it appears that a suitable
spot for the contemplated warehouse covered a por-
tion of defendant's right of way as well as a portion
of the outlying triangle.   The railroad company was
interested in promoting the building and running of
this warehouse as an adjunct or feeder to its busi-
ness as a common carrier of freight, and to this end
the broken thread of negotiations with Mr. Lambert
was taken up.    Anderson was not willing to build
unless the railroad company acquired the triangle—
the only access to the warehouse for the public at
large, we infer from the map, being over the triangle—
and so notified the railroad company.

We shall not swell the opinion with the evidence
in detail.   Counsel on both sides in  oral  argument
quoted from the transcript sent to this court in long
form.   Many times and oft, by iteration and reitera-
tion, we have referred the Bar to our rules requiring
a *printed abstract* of the evidence (in cases turning
on the facts) and have pointed out that we will not
hunt through a transcript as with a lighted candle
to find the evidence.   In this case appellant has fur-
nished an abstract.   No counter abstract is furnished
by respondent nor is any complaint made that appel-
lant's abstract is not fair and full.   In this condition

of things appellant's abstract is conclusively presumed to contain all the record essential to a just determination of the case on appeal.

From that abstract it appears that a Mr. Crowder (the superintendent of Houck's Missouri & Arkansas Railroad Co.), a Mr. Hunter (then connected with that company in acquiring rights of way, etc.), and Mr. Anderson met at Benton station to settle the matter in hand. There is some divergence in the testimony, on immaterial points, for instance, as to whether conversations with Lambert were held at the station or in a nearby field, or at both points, and some divergence as to who was present when these conversations were held, but it persuasively appears that at that time and place, either in the field or at the station and before a lick was struck by Anderson in building a warehouse, it was ascertained from Lambert that his price for the triangle was fifty dollars and that he was willing to sell it at that figure. There is no dispute about that one vital fact. There is no dispute about another fact, equally vital, to-wit, that thereupon the three parties named pooled what ready cash they had in pocket, and, scraping together so much as fifty dollars, they caused it to be paid over to Lambert for the triangle on behalf of the railroad company. That Lambert in pursuance of his offer to sell and in pursuance of their willingness to buy (and buying) received said fifty dollars as the purchase price of that bit of land and put the money in his own pocket, there is not a particle of doubt. Neither is there any doubt about the fact that he has kept that money to this day. What happened then as shown by this record? Facts of further vital significance are disclosed following in logical order hard on the heels of that transaction in 1894, showing visible exercise of ownership and possession by the railroad company with Lambert's consent. For instance, it at once closed

an agreement with Anderson granting a permit in the nature of a lease to him to build and run a grain warehouse, located on a part of the original right of way and a part of the triangle; and Anderson at once erected the warehouse close to the switch then in existence (or subsequently laid) and went into business there. Presently, too, a Mr. Crenshaw, under a like permit from defendant's predecessor, built another grain warehouse similarly located and went into business. The record shows that not only did the railroad company take open and unequivocal possession of the triangle, through Anderson and Crenshaw, but that thenceforward it was used for necessary shipping purposes in loading and unloading wagons and cars of freight and storing heavy freight and that it was devoted, as intended by the railroad company, to commercial purposes in giving the public access over it to the warehouses and to the depot. True, the earmarks of this possession were not the earmarks of the possession of a farmer in using a piece of cultivating land, but the possession disclosed by the testimony was of a character incident to the railroad business and such as is usually taken and held by railroad companies of station grounds at country points. The evidence preserved in the abstract further shows that Mr. Lambert knew these warehouses were built under the permission of defendant's predecessor on this very land. He knew the negotiations leading up to the purchase were for that very purpose and, so knowing, he acquiesced in it. As time went on Mr. Anderson sold his warehouse and Crenshaw sold his, and Mr. Lambert either directly from them or through their vendees or sub-vendees became the owner of both. These warehouses, under the agreement with the railroad company, did not become *fixtures* and therefore they could sell and Lambert could buy. When he took possession he engaged in handling and shipping grain himself

and continued the warehouse business. It seems that thereupon he also used the triangle in storing machinery to some extent and this without objection from the railroad company. As time went on, he dealt in corn and built some corn pens on the triangle. The record discloses that he then gave visible signs of ignoring the rights of the railroad company and to that end erected a fence connecting the corn pens with the warehouses, enclosing them. This being done without the consent of the railroad company and under an assertion of right as absolute owner, the defendant tore the fences down and, when rebuilt, again tore them down, and this suit followed. The testimony shows without contradiction that Houck's Missouri & Arkansas Co. reimbursed Anderson, Hunter and Crowder for their said fifty dollar outlay in its behalf. It shows, too, that Mr. Lambert stated to others shortly after the purchase that he had sold the triangle to the railroad company. There are indications in the record that he (subsequently, as we see it) claimed the railroad company was his debtor for an unknown amount for stock damage at an unknown time, and for ties and possibly for a board bill of an unknown amount, accruing at unknown times. It seems, furthermore, that he assumed the right to credit the fifty dollars on this old damage or board bill account or on some sort of running account, including the purchase of the triangle as one item; but the record is barren of any testimony showing that he made such credit by any arrangement with the railroad company or with those representing it. It seems when he was applied to for a deed, that at first, he did not claim he had made a conditional sale of the triangle, but that subsequently on another demand he expressed himself as willing to make a deed *if the old account was settled.* The evidence is in such a shape that we cannot escape the conclusion that Mr. Lambert, having received his

price for the land and allowed the railroad company to deal with the world as its owner, as an afterthought concluded to hold back the deed as a sort of security for an unsettled account disconnected from the land sale. Before the trial of the case Mr. Crowder died, and, on the theory that the purchase contract was made with him, Lambert was not allowed to testify to its terms. We may say there was some evidence that, shortly before the suit, there was a kind of possession held of the triangle by all parties in interest, known to the books as a "scrambling possession." It seems also that at one time, as a somewhat public matter, and with some little public assistance, for the benefit of himself, his patrons and the patrons and employees of the railroad company, Lambert caused a well to be sunk on the triangle which furnished water to persons having business with the railroad, or with him as a warehouseman; but, as said, the evidence indicates to our minds that any subsequent visible acts of possession of Lambert, after he made his contract to sell the triangle, commenced with, and were mere incident to, his purchase of the two warehouses and that he got into whatever possession he has now through and under cover of that purchase.

Attending to the pleadings, it will do to say that the bill alleged facts which if true entitled plaintiff to relief. By its answer defendant admitted its incorporation, but denied all and singular each and every other allegation in the petition contained. By way of affirmative matter the answer alleged defendant owned the triangle and claimed title; that plaintiff claims some title or interest in said real estate adverse to the defendant, and prayed the court to try, ascertain and determine the interest of the defendant and plaintiff respectively to said real estate and by its decree to adjudge, settle and define whatever interest the de-

fendant and the plaintiff may have in and to the same. In reply, plaintiff denied that defendant owned or had any right, title or interest in and to said premises, or that it did so have at the dates mentioned in the petition or at any other time.

The trial below and briefs here proceed somewhat on the theory that defendant seeks a specific performance, but in strictness defendant's paper case is on section 650, relating to quieting title.

On such record is the decree, *nisi,* equitable? We think not. And this, because:

I. There being an issue on the fact of possession and some evidence that its character was that of a "scrambling possession" at the very time defendant is alleged to have broken plaintiff's close and committed the trespasses complained of (threatening to continue such alleged wrongful acts) it is argued that plaintiff was not entitled to his remedy by injunction. But this view is wide of the merits of the concrete case in judgment and may be profitably passed by.

II. It is argued it is apparent that plaintiff's damages are not irreparable nor is defendant insolvent, and, having an adequate remedy at law, he should be cast. But from ancient times it has been held that equity will interfere in cases of this character to avoid multiplicity of suits and will entertain a proceeding to enjoin, which by analogy may be said to be in the nature of a bill of peace. Without discussing the limitations of the doctrine, we announce our concurrence in the views of VALLIANT, J., in that behalf, and proceed to consider the main proposition—the foregoing, with other, questions raised by counsel not being deemed material.

III. That proposition is this:

Conceding the dry naked legal title to the triangle to be in plaintiff—conceding even that the possession

of both parties or of one or the other at the time of suit is not of such a character in quality or time as ripened into a title by mere limitation as between them, then, had defendant under the facts of this record an equitable title to the land? and herein of the Statute of ·Frauds.

The contract between Lambert and the predecessor of defendant in 1894 was concededly verbal. The courts are not in accord on what elements of part performance take a verbal contract for the purchase of real estate out of the Statute of Frauds. Happily, this case is freed from any call to discuss the nice refinements found in the case learning in that regard; for, if it once be determined that the case is one of such performance by the vendee as payment of the full purchase price and the vendee's taking possession under the contract with the consent of the vendor, then, all the cases hold that the concurrence of those facts takes the case out of the Statute of Frauds.

Referring to the record facts hereinbefore uncovered and set forth, we hold that the terms of the contract, including the price to be paid and a sufficient ascertainment of the parcel of land involved, are established to a moral certainty. We hold that the evidence establishes beyond doubt that said price was paid as purchase money, was accepted and retained as such, and that possession by virtue of that contract was taken by the railroad company with the consent of Mr. Lambert.

It is argued by plaintiff's learned counsel that their client from start to finish retained possession of the triangle. They admit he knew the warehouses were being built with his acquiescence, but they say he was willing the land might be used for a quasi-public purpose in which he was interested. That he had the right to take his fence down and in a neighborly and passive way permit Anderson, Crenshaw and the railroad

company to use the land. That he did not have to stand on the land and blow a trumpet proclaiming his ownership, or with force and arms assert his domination as owner. All these things (barring continuous possession as owner) may be graciously conceded to learned counsel, but that concession does not help plaintiff; because this record discloses that neither the railroad company nor Crenshaw nor Anderson nor the public having business with the depot or warehouses ever occupied the triangle for business ends until after the railroad had paid the purchase price. The record shows that what they did thereafter naturally flowed from the purchase by the railroad company and is referable alone to that fact. It shows that the railroad company visibly asserted its domination over the triangle by exercising rights belonging only to a paramount owner and always claimed ownership. It blew a trumpet of ownership when it openly contracted with Anderson and Crenshaw to build warehouses on the *locus* and adjusted its business affairs to deal with those warehouses. It did not have to fence the ground to assert its proprietorship. Its acts of ownership and possession were precisely those to be expected, as said, of a railroad company at its depot grounds at shipping points in the country. Mr. Lambert with his eyes wide open to these acts and with his pocket (figuratively) bulging with the contract price must be held to have consented to such possession in the absence of protest made at the time. This is one of those cases where acts speak louder than words—where silence shows consent. With such possession taken and used by consent, fortified by a precedent payment of the purchase price in compliance with the verbal contract, the paramount equitable title vested, *ipso facto* and *eo instanti,* in the railroad company as against the whole world (including Lambert)

and thenceforward he held merely a naked legal title seized to the use of his vendee. [Shaffer v. Detie, 191 Mo. l. c. 392, *et seq.,* and cases cited; Bean v. Valle, 2 Mo. 126; Price v. Hart, 29 Mo. 171.] Between the earliest and the latest case, *supra,* an array of others to the same effect might be cited from this court.

Under the facts, defendant was entitled to specific performance in a strict sense if the pleadings had been drawn on that theory. However, having the paramount equitable title, defendant was entitled on the pleadings under section 650 to have the same ascertained and determined, defined and adjudged in and to the triangle. Being so entitled, the plaintiff was not entitled to a decree enjoining defendant from entering upon its own land and removing fencing not there by its permission.

Under defendant's answer and the evidence the plaintiff was entitled to a finding that he owned the warehouses and corn pens on the triangle, as the vendee of those who built them under a permit from defendant, with a right to have them remain until the verbal permit in the nature of a lease is brought to an end as provided by statute.

The premises considered, the judgment is reversed and the cause remanded with directions that the chancellor, *nisi,* enter a decree dissolving the injunction; adjudging the paramount equitable title to the triangle (describing it as in plaintiff's petition) in defendant; finding that plaintiff is the owner of the warehouses and corn pens with the right to have them be and remain upon the triangle and in his use for warehouse purposes until his permit in the nature of a verbal lease be brought to an end as provided by statute, and to make such other orders and entries relating to costs and damages on the dissolution of the injunction as may accord with equitable procedure.

*Gantt, C. J., Fox, Graves* and *Woodson, JJ.,* concur; *Burgess, J.,* concurs in the result; *Valliant, J.,* dissents in a separate opinion.

## DISSENTING OPINION.

VALLIANT, J.—This is a suit in equity to enjoin defendant from committing trespasses on certain land described in the petition, which the plaintiff claims as his property. The answer is a general denial and a cross-bill asserting title in defendant and praying to quiet title under section 650, Revised Statutes 1899. Reply, general denial. The decree was for the plaintiff, declaring that the land was his, and enjoining the defendant from committing the trespasses complained of. Defendant appealed.

The subject of the suit is a small triangle at Benton station on defendant's railroad, having the Benton and Blodgett public road for its west side, the Benton and Charleston public road for its north side and the right of way of the defendant railway company for its east or third side. The main facts in the case, except one which will be hereinafter separately considered, are practically undisputed. Before the building of the railroad the land in dispute and the land around it belonged to the plaintiff and formed a part of his farm. In fact at the beginning of the trial defendant in open court solemnly admitted that the legal title to the property was in the plaintiff and that the defendant claimed under him by purchase. This little triangle was formed by the location of the railroad which disconnected it from the rest of plaintiff's land and left it in the shape we find it. The diagram on the opposite page shows the lay of the land:

Cut off as it was from the rest of his land the plaintiff left it unfenced and, lying as it was with a public road on each of two sides and the railroad

Center of N.W. 1/4 Sec. 18   410'
T 28 R. 14

STONE

N

Lambert

Residence

BENTON

St. L. & G. Ry. — 3

& CHARLESTON ROAD.
3+72

DEPOT

Lambert

Lambert

Deed No. 6571-6587

Conn. 6-27.05

8+51

3.00 C.

2.00 C.

1679'

50
50

50
50
25'

24'

To Hothouse

St. Louis & Gulf Ry.
Station Plat
~~~~~ of ~~~~~
BENTON, MO.
Div Engineer's Office ~~~~~
~~~~ Cape Girardeau. Mo.
July 26, 1903
Scale 1".100';

right of way on the third, the public made free to use it going to and from the depot, which is close to it as will be seen from the diagram. Lambert dealt in machinery, binders, mowers, etc., and he used this triangle to put his machinery on; he also built some corncribs on it, but as a rule it was open and used by everybody to whom it was convenient.

The railroad was built in 1893. A year or two afterwards one Anderson applied to Mr. Houck, president of the railroad company, for leave to erect a warehouse on this land and the leave was given by Mr. Houck with the understanding that the building was to remain the property of Anderson and was to be used only in connection with shipping over the railroad. No written lease or license was given Anderson who built the warehouse. Subsequently one Crenshaw was given a like leave and he also built a warehouse. These two warehouses were located, as will be seen by reference to the diagram, partly on the railroad right of way and partly on this triangle. Anderson and Crenshaw used the warehouses a few years and afterwards sold them to the plaintiff, who still owns them and uses them in warehouse and shipping business. The plaintiff did not purchase directly from Anderson, but from one Heisserer to whom Anderson had sold. Before Anderson built his warehouse he, in company with one Crowder, who was vice-president of the railroad company and its superintendent, and in company also with one Hunter, went to see the plaintiff, who Anderson understood, as he testified, "set up some claim." The purpose of his visit to plaintiff as he himself testified was "in order to make some kind of a settlement about the matter before I erected the warehouse." What occurred during that visit constitutes the main point in dispute in this case and we will return to it again, but for the present it is sufficient to say that it was sufficiently satisfactory to

the mind of Mr. Anderson and he built the warehouse.

Mr. Houck who was then president of the railroad company (that is of the company which built and then owned the railroad and afterwards sold it to the defendant company) and who was a witness for defendant, testified that in the fall of 1893 the subject of building the depot at that point came on for consideration and he went there to attend to it. Seeing this little triangle he thought it would be desirable to use it in connection with the depot, and he applied to the plaintiff asking him to give it to the railroad company, but the plaintiff refused to give it and wanted to be paid for it, but as the company had no money at that time it could not purchase it. But the depot was located and built and that is the way the matter was left for the time. Witness personally had no talk with Anderson about building the warehouse and knew nothing except by hearsay of what occurred on the occasion of the visit of Anderson, Crowder and Hunter to the plaintiff already mentioned, but as president of the company he knew the warehouse was built by leave of the company officials and from that time on he considered the railroad company in possession of the little triangle in dispute. The witness said: "I considered it company property from the time Anderson built the warehouse and under the control of the company in every respect."

The foregoing are the undisputed facts, and from them we see that in the beginning it was the plaintiff's land, that he has never made a deed conveying it to the railroad company or to any one, and there has been no such adverse possession as would affect the title. It is not claimed by the railroad company that prior to the building of the warehouse by Anderson there was any exclusive possession by the railroad company, and whilst Mr. Houck testified that he considered that after the warehouse was built the triangle

was in the possession of the railroad company yet that is a mere opinion; the only difference between the public use of it before and after was that Anderson used the warehouse which he built and Crenshaw used that which he built, both of which buildings, according to defendant's testimony, remained the personal properties of these two men respectively. Besides, Mr. Houck's testimony shows that the opinion he expressed as to the company's possession was influenced by what he had heard about what occurred during the visit of Anderson and the others to plaintiff above mentioned. He was informed that $50 had been paid to plaintiff for the land and he said: "I know that furthermore we naturally insisted upon getting that deed, repeatedly talked to Crowder and others about it, that I wanted the matter straightened up, and afterwards met Mr. Lambert himself and asked him to make that deed to the property and Lambert refused to make it, saying he would not make it until we settled claims he had against us on account of stock." As to those warehouses, Anderson and Crenshaw sold them to the plaintiff, as by the agreement with the railroad company they had the right to do, and without asking leave of the company; therefore, plaintiff has possession of the warehouses not by leave of the railroad company but by purchase from the owners. The warehouses were in the exclusive possession of Anderson and Crenshaw respectively while they owned them, but it was only a few years, not long enough to make a case of title by adverse possession.

If the defendant railroad company has any right to the land in dispute it is by the alleged purchase from the plaintiff on the occasion when Anderson, Crowder and Hunter went to see him; we come, therefore, now to a consideration of the evidence bearing on that subject.

The evidence on that point is chiefly that of two

of the defendant's witnesses, Anderson and Hunter, Crowder having since died.

Anderson's testimony in his direct examination was to the effect that, having obtained leave from the railroad company to build the warehouse and having heard that plaintiff set up some claim to the land and desiring to have the matter settled before building, he went with Crowder, the railroad superintendent, to Benton station to see the plaintiff about it; at the station they met Mr. Hunter; Lambert, the plaintiff, was out in his field and Crowder went to the field and brought him to the depot and during the conversation they agreed on the price to be paid for the triangle which was fifty dollars; Crowder did not have that much money, but he had some, and he called on Anderson and Hunter and between the three the amount was raised and paid to Lambert, and witness being asked what he understood it was for, answered he understood it was for the strip of land contained in the triangle. On cross-examination he said that Lambert was out in his field a quarter of a mile away when Crowder went for him. "Q. Now you say Lambert came to the depot? A. That is my recollection. Q. Are you clear on that ? A. I am not right clear whether he came that time or whether he stopped on his way to dinner. I am not positive about that. Q. Are you positive the conversation between him and Crowder took place in your presence? A. Well, not all of it. Part of it I am—pretty positive. Q. What part of it? A. Well with reference to the price of the land. Q. That part with reference to the price of the land? A. Yes, sir. Q. Now, did the conversation between Crowder and Lambert with reference to what that payment was for take place in your presence? A. I think it did, that is, I think the matter was talked over. Of course the original agreement I think had been talked over before they came up there, but Crowder

not having sufficient money to pay it came to the station and Senator Hunter happened to be there and between us we raised $50. (By attorney for defendant): Q. Was it paid to Lambert right there? A. Yes, sir, that is my recollection. (By attorney for plaintiff): . . . Q. Now are you positive that Lambert came to the station and had any conversation with Crowder at all about it? A. I am pretty positive about it; yes, sir, pretty positive. I am not right positive as to whether he came over with Crowder at that time or came later, I know I had a conversation with Lambert before we went back with reference to the matter. I know the money was raised right there and paid over. . . . Q. To refresh your recollection in regard to Lambert coming to the depot, state if Lambert simply did not ride up there on his horse, and not stop at all. A. I think not; I think he was out in the field. Q. Coming to the depot did he not simply ride up to the depot on his horse on his way to the house? A. I don't think so. Q. Still you would not be positive about that? A. No, sir, but I think not.''

Defendant's other witness, Hunter, was somewhat clearer in his recollection of what occurred than Anderson seemed to be. Hunter testified that when he and Anderson, at the depot, gave the money to Crowder to give to Lambert to buy the land, Lambert was not present, but was out in the field, and that Crowder took the money and went out in the field where Lambert was and the only information of what passed between Crowder and Lambert was what Crowder afterwards told him. On direct examination: ''Q. Did you hear any conversation between J. H. Crowder and W. C. Lambert relative to the sale of that particular piece of ground to the Houck's Missouri & Arkansas Railroad Company? A. No, sir. . . . Q. Do you know anything about the transaction that took place

between them relative to it? A. I know something about it, but I don't know—. Q. What do you know? . . . A. I paid Crowder some money which he paid to Lambert. Q. Did you see him pay it to Lambert? A. No, sir. I think he was over in his field near the depot. He owns land all around there. I think he was working in his field. Q. Did Lambert come where you were that day? A. No, sir, he didn't come where I was that I remember of. . . . Q. Then what did Crowder do after he went to Lambert? A. I could not tell, I would have to tell what Crowder said. . . . Q. Did you hear Lambert say anything about having sold that land to the railroad company? A. I had one conversation with Lambert that I remember shortly after that, while that business was comparatively fresh and the deed was mentioned in that conversation, and he told me they failed—that when they pay me a board bill and a wood bill or tie—he mentioned two items—he says when they pay me for that I will make a deed. . . . Q. Do you know whether Lambert came to the depot after Crowder had been in the field at that time? A. I could not state. He had to go the road by the depot going home. It was about noon.''

The witness being asked to state the circumstances under which the money was given to Crowder, said: ''Well, Anderson wanted to build a warehouse and he could not build the warehouse until he got the land or until the railroad got the land, and everything was tied up in that shape, and we all wanted a warehouse and shipping facilities. I was instructed—I was acting sort of getting the right of way. I was working for the railroad at all times at that time, getting the railroad built and all that, and I knew and we all knew from both parties that it took fifty dollars to buy that piece of land. Q. You knew that is what he held it at? A. Yes, sir; and I instructed Crowder to go and

pay him $50, so we could go ahead with the warehouse; Crowder said he didn't have the money, me and Anderson, we paid him the money, and directed him to go ahead and buy it; and we would go ahead with the warehouse, and immediately after that we staked off the warehouse and took possession of the land and built it." On cross-examination: "Q. You heard no part of the conversation between Crowder and Lambert with reference to the purchase of this land? A. No, sir. Q. And you don't know what kind of promises or what kind of conditions Crowder made to Lambert? A. No, sir. . . . Q. Crowder got the money from you and Anderson and went back to the field where Lambert was? A. Yes, sir." There was testimony to the effect that Lambert admitted that Crowder had paid him $50 which he had credited on account of what the railroad owed him and that when it paid the balance he would make a deed. A witness for defendant testified that eight or ten years ago Lambert said to him that he had sold the triangle to the railroad company for $50. Lambert as a witness in his own behalf denied that he had ever made such a statement. He denied that he ever had a conversation with Anderson and Crowder together about this matter, said he was not at the depot that day at all except to ride by on his way to dinner. He stated that in June, 1895, he had dealings with Crowder representing the railroad concerning this land, that it was out in the field and no other person was present. That on that occasion he received money from Crowder. This was objected to on the ground that Crowder was dead, the objection was overruled and exception taken. There was also evidence to the effect that the railroad company reimbursed Anderson and Hunter for the money advanced.

The foregoing is substantially all the evidence that was adduced to support the claim that the railroad

company had bought the land and paid for it. Mr. Houck testified that after he had been informed of this transaction he was anxious to have it closed up and several times spoke to Crowder and others about it, that once he spoke to Mr. Lambert about it and asked him to make the deed, but Lambert refused, saying he would not make it until certain claims he had against the company were settled. Nothing was done and so the matter rested from 1895 until the fall of 1903 when the defendant company sent its employees on the premises and caused them to tear down some fences the plaintiff had erected to protect some corn cribs, which fences the plaintiff, as soon as he could, re-erected and the defendant again had them torn down and threatened to continue to tear them down whenever they were erected. Thereupon the plaintiff brought this suit to enjoin the defendant from committing the trespasses.

I. Appellant's first point is that the plaintiff has an adequate remedy at law and therefore not entitled to equitable relief. In the absence of a showing that the railroad company and the men who personally directed the tearing down of the plaintiff's fences were insolvent, the plaintiff would have a remedy at law for damages for the trespasses already committed, but if the defendant is free to carry out its threat to tear down the fences as often as they are erected, it creates a condition which calls for the aid of a court of equity to prevent constantly recurring acts of violence and a multitude of suits. We hold, therefore, that the petition states a case entitling the plaintiff to equitable relief. That is the doctrine of this court so often announced that a citation of decisions is unnecessary.

But if the plaintiff has agreed to sell this land to the defendant for a certain price and in pursuance

to that agreement has received from defendant the price agreed on and yet wrongfully refuses to execute a deed, equity will not aid him to protect his bare legal title but will leave him to seek his remedy at law.

Defendant in its answer has not tendered any such issue to the plaintiff, but the evidence adduced was on that line and the cause seems to have been tried as if that was the issue; therefore we will look into the evidence to see if it bears out the defendant's claim, at least we will review the course pursued in the trial court to see if the plaintiff is entitled to equitable relief in the face of the defendant's claim of purchase.

II. The defendant's reliance is on the alleged purchase from the plaintiff. In the opening of the trial defendant admitted the legal title to be in plaintiff and that defendant claimed by purchase from plaintiff. The purchase, if any there was, rested on the oral agreement between Crowder, representing the railroad company, and the plaintiff. An oral agreement for the purchase of land, when the contract is clearly proven and its performance on the one side is also proven, may be decreed to be specifically performed by a decree in equity, although it is outside of the Statute of Frauds. There is not much difference between counsel on that proposition, nor is it disputed that to entitle a party to a specific performance of such a contract in equity the proof must be clear, cogent and convincing. The very purpose of the Statute of Frauds, which is of ancient date, but which has so commended itself to favor that it has been enacted into the statute law of all the states of the Union, was to require certainty of proof. When equity undertook to enforce certain contracts notwithstanding they were not within the letter of the statute, it did so,

not to violate the statute, but to prevent its letter from destroying its spirit, to aid the statute in its real purpose, which was to prevent fraud. But whilst equity in such case disregards the fact that the contract was not in writing, it has never lowered the standard of certainty as to proof; it has never been satisfied with a mere preponderance of the evidence, but has always required proof that leaves no reasonable doubt. [Louthan v. Stillwell, 73 Mo. 492; Railroad v. McCarty, 97 Mo. 214; Taylor v. Von Schraeder, 107 Mo. 206; Hubbard v. Hubbard, 140 Mo. 300; Alexander v. Alexander, 150 Mo. 579; Gibbs v. Whitwell, 164 Mo. 387; McKee v. Higbee, 180 Mo. 263.]

There is another point on which equity has always insisted, that is, reasonable diligence. What diligence has the defendant shown? This transaction on which it relies occurred in the fall of 1894, a short while thereafter it was brought to the notice of the president of the railroad company and he spoke to Crowder and others about it, insisting that a deed be obtained, and spoke to the plaintiff himself, asking him to make the deed, but the plaintiff flatly refused to do so until conditions on which he insisted should be met. The railroad company, if the facts were as it contends they were, then had a right to go into a court of equity and demand of plaintiff a specific performance of his contract. Crowder, the only man besides the plaintiff who knew what the contract was, was then alive and lived for several years thereafter. But the railroad company did nothing, it slept on its rights, if rights it had, from 1894 to 1903, and not until after Crowder's death, which death rendered the plaintiff incompetent as a witness in his own behalf, was any action taken, and then the action that was taken was not the peaceable process of law but the violence of force and arms, and now the defendant seeks by fragments of conversations held eight or ten years ago to show admissions

of plaintiff out of which an inference of a contract to purchase may be drawn, while at the same time objecting to the plaintiff as a witness in his own behalf giving his testimony as to what the contract was. No. fault is to be found with the defendant for objecting to the plaintiff's testifying, that was defendant's right, but it emphasizes the disadvantage which the delay has caused the plaintiff.

But, passing over the delay, what was the proof? Mr. Anderson in his direct testimony, whilst admitting that he did not hear all the conversation in regard to the matter between Crowder and the plaintiff, yet says that to the best of his recollection Crowder went to the field and brought the plaintiff back with him to the depot and there the money was paid to the plaintiff in the presence of the three, witness, Crowder and Hunter; and he said that he understood the payment to be in purchase of the land. That was a mere inference of his which may or may not have been justified. He did not undertake to say that he ever heard Lambert say so. Lambert may have been satisfied to allow him to build a warehouse on the line and that was really all that Anderson was interested in, but parting with the title to the whole triangle was another matter.

On cross-examination Anderson shows that he is not at all certain about any of the main points, not even that Lambert was at the depot. But the other witness of defendant, Hunter, who was there is quite positive that Lambert was not there, that he and Anderson gave the $50 to Crowder who took it to the field where Lambert was and the only thing Hunter knew about what occurred between Crowder and Lambert in the field is what Crowder afterwards told him. Is this such clear, cogent and convincing proof of defendant's claim of an oral contract as meets the de-

mands of a court of equity? With the above testimony is also to be considered the fact that defendant, as soon as a demand therefor was made, positively refused to make a deed and told the president of the road that he would not do so until the railroad company settled his claims. There was a direct defiance of the claim, and instead of taking up the challenge, the railroad company let the matter drop.

Defendant's evidence to prove the oral contract not only does not satisfy the high standard of proof equity requires but even the preponderance is against it.

III. It is assigned as error that the court permitted the plaintiff to testify in relation to the transaction between him and Crowder. The plaintiff did not undertake to tell of anything that was said between Crowder and himself; he denied that he was at the depot on that day except to ride past it, but that was in contradiction of the testimony of Anderson, a living witness. He did testify that Crowder gave him the money in the field, but that again was in contradiction of the statement of Anderson that it was given to him at the depot. True, to say the money was given him in the field, was to that extent saying what transpired between him and Crowder when there was no one else present, but the fact that the money was paid him was one that defendant was endeavoring to prove and therefore that evidence was only an admission of that fact; it contradicted only what Anderson had said as to the place and corroborated what defendant's witness Hunter said. We see no error in that. The plaintiff was asked if he had ever made a deed to the company for the property and he answered No, then he was asked why, and he answered because he had never sold the land. There was no objection to that question until after it had been answered, then

.the objection was made that it was incompetent because Crowder was dead. There was no error in that.

I find no error in the record. The judgment should be affirmed.